# United States Court of Appeals
## For the First Circuit

No. 14-1688

UNITED STATES OF AMERICA,

Appellee,

v.

MICHEL D'ANGELO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Barron, Circuit Judges.

David J. Van Dyke and Hornblower Lynch Rabasco & Van Dyke, P.A., on brief for appellant.
    Renée M. Bunker, Assistant United States Attorney, and Thomas E. Delahanty II, United States Attorney, on brief for appellee.

October 6, 2015

**TORRUELLA, Circuit Judge**.  Defendant-appellant Michel D'Angelo ("D'Angelo") pleaded guilty to bank robbery, 18 U.S.C. § 2113(a), and was sentenced to 180 months' imprisonment, a downwardly variant sentence.  He appeals the district court's denial of credit for acceptance of responsibility under the United States Sentencing Guidelines ("U.S.S.G.") § 3E1.1.  Finding no error, we affirm.

## I.  Facts

Because D'Angelo pleaded guilty, our discussion of the facts is drawn from the change-of-plea colloquy, the unchallenged portions of the Presentence Investigation Report ("PSR"), and the transcript of the sentencing hearing.  See United States v. Cintrón-Echautequi, 604 F.3d 1, 2 (1st Cir. 2010).

On September 21, 2012, D'Angelo and his then-girlfriend, Jennica Miller ("Miller"), robbed the Kennebunk Savings Bank ("KSB") in Berwick, Maine.  D'Angelo entered the bank dressed as a woman in a pink sweatsuit, wearing a wig and sunglasses, and carrying a purse, while Miller called 9-1-1 and falsely reported having just been stabbed by her boyfriend in a mobile home park in an attempt to distract the police.[1]  D'Angelo carried a screwdriver "he planned to display as a weapon if the bank tellers were not

---

[1]  Shortly before the bank robbery, Miller also called 9-1-1 and falsely reported having just been stabbed by her boyfriend behind an outlet store.  D'Angelo instructed Miller to place both of these 9-1-1 calls.

compliant with his demands."[2]   He approached a bank teller, demanded cash, and -- according to the witnesses -- threatened to set a bomb off if any alarm button was pressed.  After obtaining $1,298, D'Angelo fled the scene with Miller.

Two days after the robbery, the police recovered a series of items that had been discarded along the side of the road, less than a mile away from the KSB.  These included a bleach-soaked pink sweatsuit, a wig, and a screwdriver, among other things.  Authorities later confirmed that these items belonged to Miller.[3]  A confidential informant and a family member identified the bank robber depicted in KSB surveillance images as D'Angelo.

D'Angelo was arrested on April 11, 2013, for bank robbery.  On June 18, 2013, an indictment charged him and Miller with bank robbery in violation of 18 U.S.C. § 2113(a) and aiding and abetting such conduct in violation of 18 U.S.C. § 2.  D'Angelo initially pleaded not guilty, and filed two motions to suppress evidence, which the government opposed.  He then withdrew both motions and, on February 13, 2014, entered a straight guilty plea.[4]  At his change-of-plea hearing, D'Angelo admitted to all the facts

---

[2]  Although D'Angelo denies possessing a screwdriver during the robbery, the district court found by preponderant evidence that he did possess the screwdriver.

[3]  Miller's DNA was found on the pink sweatsuit jacket and the wig.  Subsequently, Miller's mother identified the pink sweatpants and purse worn by D'Angelo as belonging to her daughter.

[4]  On January 14, 2014, Miller pleaded guilty as charged.

stated by the government in its "Prosecution Version," but clarified that he did not intend to threaten anyone when he entered the bank and could not recall doing so while inside.

D'Angelo was held at the Cumberland County Jail ("CCJ") from his arrest on April 11, 2013, until March 8, 2014, when he was transferred to the Maine State Prison. Between April 11, 2013, and February 13, 2014, while at the CCJ, D'Angelo violated several rules, conduct which resulted in seven disciplinary actions. These violations included: making intoxicants; possessing contraband; refusing to provide a breath and/or urine sample; opening a secured slider door; and possession of piercing/tattooing equipment, which resulted in his reclassification from medium to maximum security within the CCJ. Another disciplinary action involved a verbal interaction between D'Angelo and a correction officer in which D'Angelo purportedly stated, "[i]f I receive twenty years as soon as I return to this jail and my handcuffs are removed, I'm going to break the jaw of the closest intake officer."

On March 8, 2014, after he had pleaded guilty, D'Angelo and a female inmate in the maximum-security wing of CCJ both jammed the locks of their cell doors to prevent the doors from locking. The female inmate then exited her cell, crossed to the male section of the facility, and entered D'Angelo's cell, where they spent more than three hours engaging in consensual sex before being discovered by a guard. Following this incident, D'Angelo cut himself and was

-4-

placed on suicide watch before being transferred to the Maine State Prison.

During his time at CCJ, D'Angelo also sent several letters to Miller, instructing her to write to him using a "bogus name," providing her with a "script" of what to say if called to testify in court, and telling her to "figure a way" to get their cases severed. He suggested that Miller "get a psych eval[uation], drug rehab, fucking pregnant, something, just stall," to get her case "continued as long as possible" because "he need[ed]" to be tried first.

The PSR calculated a total offense level of thirty-two for D'Angelo, broken down as follows: a base offense level of twenty pursuant to U.S.S.G. § 2B3.1(a); a two-level increase for taking property from a bank (U.S.S.G. § 2B3.1(b)(1)); a three-level increase for possession of a dangerous weapon (screwdriver) (U.S.S.G. § 2B3.1(b)(2)(E)); a two-level increase for his aggravating role because he directed Miller to place false 9-1-1 calls to distract the police (U.S.S.G. § 3B1.1(c)); and a two-level increase for his attempt to obstruct justice by influencing Miller to commit perjury (U.S.S.G. § 3C1.1). These calculations produced an adjusted offense level of twenty-nine, but, because D'Angelo's prior convictions rendered him a career offender (with a Criminal History Category of VI),[5] his adjusted offense level was thirty-

---

[5] D'Angelo had at least fifteen prior convictions.

two.  The result was a Guidelines sentencing range ("GSR") of 210-262 months, but the 240-month statutory maximum lowered that range to 210-240 months.

The PSR did not recommend a three-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1 for several reasons.  First, while D'Angelo provided the Probation Officer with a written statement taking full responsibility for his conduct, he denied any recollection of having threatened the bank teller with a bomb.  Second, D'Angelo's conduct while at the CCJ revealed no indication of repentance and demonstrated that he had not ceased criminal conduct.  Third, D'Angelo attempted to obstruct justice through his letters to Miller.

D'Angelo objected to the PSR's recommendations to apply an obstruction of justice enhancement and to deny a § 3E1.1 reduction for acceptance of responsibility.  He argued that his intention to put an end to a lifetime of criminality was evident through his conscious decision to waive the suppression issues, his guilty plea, and the fact that all his disciplinary actions while incarcerated -- except for the sex incident -- occurred prior to his guilty plea.  The PSR was not altered.

Additionally, in a motion for a variant sentence, D'Angelo highlighted his troubled childhood -- including having lost his father at age six to suicide, living with an abusive step-father, and falling from the second story of a building and

fracturing his skull, which "annihilated" the impulse control center of his brain -- his history of mental-health diagnoses, and alcohol and poly-substance abuse.

At his sentencing hearing, D'Angelo denied that he possessed a screwdriver during the robbery. He also clarified that he did not recall whether he made a bomb threat while at the bank, and could neither confirm nor deny having done so. In addition, D'Angelo admitted that he committed the disciplinary violations while incarcerated and that he "sent letters to [Miller] . . . about spinning a web of lies to make their case more viable." While he conceded that the letters constituted an obstruction of justice and thus warranted the enhancement, he argued that he was nevertheless entitled to credit for acceptance of responsibility under § 3E1.1 because, except for the sex incident, everything else occurred before he pleaded guilty and after that he "manned up" and behaved as "a model person" for around four months. The government opposed D'Angelo's request for credit under § 3E1.1 for essentially the same reasons stated in the PSR.

The district court stated that it would not consider or hold "against him" the fact that D'Angelo did not recall making the bomb threat because his lack of recollection could be due to D'Angelo's brain injuries or adrenaline. However, the court also stated that the possession of the screwdriver would be considered relevant conduct to the offense and found, based on Miller's

testimony and the corroborating evidence,[6] that the government proved by preponderant evidence that he did have a screwdriver when he robbed the bank. It also found that D'Angelo's letters to Miller warranted an obstruction of justice enhancement. The district court then denied the § 3E1.1 reduction for acceptance of responsibility because D'Angelo did not admit to the offense's relevant conduct (possession of the screwdriver), and because a finding of obstruction of justice generally indicates that acceptance of responsibility should not be given unless it is an extraordinary case and the district court did not consider this an extraordinary case. In addition, the district court referenced D'Angelo's conduct while incarcerated at CCJ and found that he had failed to withdraw completely from criminal conduct.

The district court adopted the PSR's Guidelines calculation, which yielded a GSR of 210-240 months (as reduced by the 240-month statutory maximum). Although the district court denied the § 3E1.1 reduction for acceptance of responsibility, it acknowledged that D'Angelo pleaded guilty, "gave up a suppression motion," and significantly improved his behavior, for which he "should get some credit" by means of a "variance." In the court's view, that was appropriate given D'Angelo's "mental health issues and his brain trauma." The sentencing judge then stated that he

---

[6] The screwdriver was found at the side of the road along with the clothing used in the robbery.

would give D'Angelo the equivalent of two points for acceptance of responsibility by way of a variance. That produced a variant range of 168-210 months. After considering the advisory Guidelines, the sentencing factors in 18 U.S.C. § 3553(a) -- especially the nature and circumstances of the offense, D'Angelo's history and characteristics, and the need to protect the public -- the court sentenced D'Angelo to 180 months' imprisonment followed by three years of supervised release, restitution of $1,298, and a monetary assessment fee of $100. This appeal followed.

## II. Discussion

D'Angelo challenges the district court's determination that he did not accept responsibility for his offense and, thus, was not entitled to an offense-level reduction under § 3E1.1. Although he concedes that an obstruction of justice enhancement was appropriate based on his letters to Miller, he argues that credit for acceptance of responsibility under § 3E1.1 "is not definitively inconsistent with allegations of obstruction of justice." Furthermore, D'Angelo alleges that he should not be denied credit on account of conduct that occurred prior to his guilty plea.

We review "a sentencing court's factbound determination that a defendant has not accepted responsibility" for clear error. United States v. Jordan, 549 F.3d 57, 60 (1st Cir. 2008); see also United States v. Royer, 895 F.2d 28, 29 (1st Cir. 1990). We will not reverse unless we are "left with a definite and firm conviction

that a mistake has been committed."  Brown v. Plata, 131 S. Ct. 1910, 1930 (2011) (internal quotation marks omitted); see also Royer, 895 F.2d at 29.  Nevertheless, we conduct a plenary review of any related legal questions, including interpretation of the Sentencing Guidelines.  United States v. Deppe, 509 F.3d 54, 60 (1st Cir. 2007) (citing United States v. Talladino, 38 F.3d 1255, 1263 (1st Cir. 1994)).

U.S.S.G. § 3E1.1 provides for a two-level reduction "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense."[7]  U.S.S.G. § 3E1.1(a).  But a defendant who enters a guilty plea is not automatically entitled to this adjustment.  United States v. Franky-Ortiz, 230 F.3d 405, 408 (1st Cir. 2000).  Rather, the defendant must demonstrate "'candor and authentic remorse' as opposed to mouthing a 'pat recital of the vocabulary of contrition.'"  United States v. McLaughlin, 378 F.3d 35, 39-40 (1st Cir. 2004) (quoting Royer, 895 F.2d at 30).  He has "the burden of proving his entitlement to an acceptance-of-responsibility credit."  Franky-Ortiz, 230 F.3d at 408 (quoting United States v. Ocasio-Rivera, 991 F.2d 1, 4 (1st Cir. 1993)).

---

[7]  It also provides an additional reduction of one level if the defendant qualifies for the two-level decrease, has an offense level of sixteen or greater, and the government moves for an extra reduction for his assistance to authorities.  U.S.S.G. § 3E1.1(b). However, this additional one-level reduction is not at issue here because it is uncontested that the government was not going to file any motion for a further reduction.

Application Note 4 to U.S.S.G. § 3E1.1 provides that conduct resulting in an obstruction of justice enhancement ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct, although it acknowledges that there may be an extraordinary case in which an adjustment under § 3E1.1 may apply despite a finding of obstruction of justice. U.S.S.G. § 3E1.1 cmt. n.4. "In such instances, the defendant has the burden of proving that an adjustment for acceptance of responsibility is warranted." United States v. Maguire, 752 F.3d 1, 6 (1st Cir. 2014) (citing United States v. Gonzales, 12 F.3d 298, 300 (1st Cir. 1993)).

Although a case where both an obstruction of justice enhancement and credit for acceptance of responsibility coexist is "hen's-teeth rare," id., D'Angelo nonetheless claims that such is his case. He merely states that his case is extraordinary because he "unambiguously acknowledged his wrongdoing and ceased criminal activities at the point of his change-of-plea." His attempt falls short. See id. (noting that the defendant's "on-the-spot admission of his role in the surveilled drug sale, his divulgement of the existence and location of the stash house, his consent to the search of that structure and to the seizure of contraband from it, his guilty plea, his compliance with the terms of his pretrial release, and his avowals of contrition" did not compel a finding that his case was extraordinary).

Here, the district court's finding that D'Angelo had falsely denied possession of the screwdriver during the bank robbery cuts against D'Angelo's claim that he "unambiguously acknowledged his wrongdoing." D'Angelo does not argue that this finding is clearly erroneous, see Royer, 895 F.2d at 29, and, based on Miller's testimony and the corroborating evidence found along the side of the road, it seems that he could not seriously do so. In addition, contrary to D'Angelo's assertion that he "ceased criminal activities at the point of his change-of-plea," the district court found that criminal activity continued even beyond his guilty plea, as evidenced by his involvement in the sex incident. Again, D'Angelo has failed to show that this finding is clearly erroneous. See id. Thus, we will not overturn the district court's decision.

Furthermore, although the district court could have relied on the obstruction of justice alone to deny D'Angelo credit under § 3E1.1 given the lack of extraordinary features in this case, it also premised its decision on D'Angelo's denial of relevant conduct. Application Note 1(A) to U.S.S.G. § 3E1.1 provides that "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." U.S.S.G. § 3E1.1 cmt. n.1(A). Based on Miller's testimony and the corroborating evidence found along the side of the road, the

district court found by a preponderance of the evidence that D'Angelo possessed a screwdriver during the robbery and that he displayed it as a weapon. The district court also found that the possession of a screwdriver was relevant conduct to the offense, and that D'Angelo falsely denied it. D'Angelo does not argue that these determinations were clearly erroneous, and we see no reason to conclude so. See Royer, 895 F.2d at 29. Thus, there was an additional ground to deny him credit for acceptance of responsibility.

Finally, D'Angelo argues that only conduct subsequent to his guilty plea is relevant and, therefore, he should not have been denied credit on account of conduct that occurred prior to his guilty plea. D'Angelo's argument is contrary to our precedent, which has allowed courts to consider a defendant's conduct after he has been charged, regardless of whether said conduct took place before or after the defendant pleading guilty. See Jordan, 549 F.3d at 61 (holding that "a district court, in determining the propriety vel non of an acceptance-of-responsibility credit, may consider a defendant's commission of any post-indictment criminal conduct, whether or not it bears a significant connection to, or constitutes a significant continuation of, the offense of conviction"); McLaughlin, 378 F.3d at 38 (holding that "when a defendant commits new offenses after having been charged and those offenses reflect adversely on the sincerity of the defendant's

avowed contrition, the sentencing court may treat the commission of those offenses as an indication that the defendant has not accepted responsibility for the original crime" (citing United States v. Carrington, 96 F.3d 1, 9 (1st Cir. 1996))); United States v. Zanni, No. 95-1126, 1995 WL 492971, at *2 (1st Cir. 1995) (holding that "a defendant's . . . conduct, following the offense of conviction but before a guilty plea, 'certainly could shed light on the sincerity of a defendant's claims of remorse' and may be considered" (quoting United States v. O'Neil, 936 F.2d 599, 600 (1st Cir. 1991))). Thus, the district court properly considered D'Angelo's conduct while incarcerated at the CCJ, all of which he admitted, and which provided yet another reason for denying him acceptance-of-responsibility credit. See U.S.S.G. § 3E1.1 cmt. n.1(B) (providing that "voluntary termination or withdrawal from criminal conduct or associations" may be considered in determining whether a defendant qualifies for credit under § 3E1.1); see also Jordan, 549 F.3d at 60.

### III. Conclusion

For the reasons elucidated above, we conclude that the district court did not commit any error, much less clear error, in denying D'Angelo a reduction for acceptance of responsibility. Thus, his sentence is affirmed.

**AFFIRMED.**